## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

AMERICAN PATRIOT INSURANCE AGENCY, INC,. AN )
ILLINOIS CORPORATION, DIANE M. HENDRICKS )
AND KENNETH A. HENDRICKS, )

                Plaintiffs, )

    v. )

MUTUAL RISK MANAGEMENT, LTD., A BERMUDA )
CORPORATION, MUTUAL INDEMNITY (BERMUDA), )
LTD., A BERMUDA   CORPORATION, COMMONWEALTH )
RISK SERVICES, L.P., CUNNINGHAM-LINDSEY, INC., )
A TEXAS CORPORATION, GLENN PARTRIDGE, )
AN INDIVIDUAL, DAVID ALEXANDER, )
AN INDIVIDUAL, AND RICHARD TURNER, )
AN INDIVIDUAL, )
                      )
              Defendants. )

**JUDGE CASTILLO**

Case No.:

**02C 2728**

Judge:

**MAGISTRATE JUDGE MASON**

**DOCKETED**
APR 1 7 2002

FILED-ED4
02 APR 16 PM 12: 55
CLERK U.S. DISTRICT COURT

### COMPLAINT AND JURY DEMAND

    Plaintiffs American Patriot Insurance Agency, Inc. ("American Patriot"), Diane M. Hendricks

and Kenneth A. Hendricks (collectively, the "Hendricks"), for their Complaint against Mutual Risk

Management, Ltd., Mutual Indemnity (Bermuda), Ltd., Commonwealth Risk Services, L.P.,

Cunningham-Lindsey, Inc., Glenn Partridge, Richard Turner and David Alexander, state as follows:

### NATURE OF THE ACTION

    1.    This action arises out of the Defendants' gross mismanagement of an insurance program

to provide coverage for workers' compensation, automobile liability and general liability for roofing

contractors who sought insurance through Plaintiff American Patriot.  Certain of the Defendants

subsequently attempted to conceal and compensate for their mismanagement by conspiring to defraud

the Hendricks out of millions of dollars in connection with that insurance program.  Through this action,

Plaintiffs seek to recover their actual damages, which include losses attributable to the Defendants'

initial mismanagement of this insurance program and those damages caused by the subsequent fraud perpetrated by certain of the Defendants. Plaintiffs further seek an accounting of all funds entrusted to the Defendants, treble damages, punitive damages, and to have certain fraudulently induced contracts set aside.

## THE PARTIES AND THEIR AFFILIATES

2.     Plaintiff, American Patriot, is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Oak Brook, Illinois.

3.     Plaintiffs, Diane M. and Kenneth A. Hendricks, are residents of the State of Wisconsin who regularly conduct business in Illinois. The Hendricks are the sole shareholders of American Patriot.

4.     Defendant, Mutual Risk Management, Ltd. ("Mutual Risk"), is an entity existing under the laws of Bermuda that, until approximately April 3, 2002, was publicly traded on the New York Stock Exchange ("NYSE"). Following the Securities & Exchange Commission's release of Mutual Risk's revised 10-K report, Mutual Risk's stock plummeted from an annual high of $12.60 per share to close at $.60 per share on April 2, 2002, at which time the NYSE delisted the stock.

5.     Defendant, Mutual Indemnity, Ltd. ("Mutual Indemnity"), is an entity existing under the laws of Bermuda which transacts business in the United States on an ongoing basis, including the ongoing transaction of business in Illinois, Pennsylvania and California.

6.     Non-party Legion Insurance Company, Inc. ("Legion") is a corporation organized and existing under and the laws of the State of Pennsylvania. By order dated March 29, 2002 and effective April 1, 2002, Legion was placed into rehabilitation by the State of Pennsylvania. Plaintiffs have not named Legion as a defendant in this action pursuant to the Pennsylvania Court's March 29, 2002 order enjoining the filing of such actions.

7.     Non-party Villanova Insurance Company ("Villanova") is a corporation organized and existing under the laws of the State of Pennsylvania. By order dated March 29, 2002 and effective April 1, 2002, Villanova was placed into rehabilitation by the State of Pennsylvania. Plaintiffs have not named Villanova as a defendant in this action pursuant to the Pennsylvania Court's March 29, 2002 order enjoining the filing of such actions.

8.     Defendant, Commonwealth Risk Services, L.P., is a Pennsylvania limited partnership with offices in Pennsylvania. Commonwealth Risk serves as the marketing arm of Mutual Risk Management, Mutual Indemnity, Legion and Villanova and, upon information and belief, is owned and controlled by Mutual Risk.

9.     Defendant, Glenn Partridge, was and is a member of the Board of Directors of Mutual Risk and an Executive Vice-President of Legion and upon information and belief is a resident of Pennsylvania.

10.     Defendant, Richard Turner, was and is a member of the Board of Directors of Mutual Risk and the President of Commonwealth Risk and upon information and belief is a resident of Pennsylvania.

11.     Defendant, David Alexander, is the president of Mutual Indemnity and upon information and belief is a resident of Bermuda. Mr. Alexander regularly travels to the United States to conduct Mutual Indemnity's business and, on information and belief, has derived personal pecuniary gain from the transactions at issue in this Complaint.

12.     At all times relevant hereto, Mutual Risk, Mutual Indemnity, Legion, Villanova and Commonwealth Risk acted as one entity in all conduct towards Plaintiffs, with each acting with authority to bind the other in contractual negotiations and as part of a scheme to commit fraud. As a

result, when appropriate, those entities will be referred to collectively as "the Mutual Entities" throughout this Complaint.

13.     Cunningham-Lindsey is a corporation organized and existing under the laws of the State of Texas with its principal place of business in Texas.  Cunningham-Lindsey has offices in Illinois and conducts business in Illinois on an ongoing basis.

## JURISDICTION

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that the amount in controversy exceeds $75,000 and is between citizens of different states and/or an alien entity. This Court also has original jurisdiction over this matter pursuant to 28 USC §1331 as Plaintiffs' claims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C.A. §1962, arise under the laws of the United States.

15.     This Court has personal jurisdiction over each Defendant in that each entity has purposefully availed itself of the laws of the State of Illinois, routinely conducted business in this State and/or committed a wrongful act in this State.

## VENUE

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1)(2)(d) in that a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and it is a judicial district in which all Defendants are subject to personal jurisdiction.

## ALLEGATIONS COMMON TO ALL COUNTS

17.     This case arises from an insurance program the Mutual Entities marketed in the United States and internationally as a "rent-a-captive" facility.  Upon information and belief, the Mutual Entities have set up hundreds of such programs, all of which require the participation of several of the

Mutual Entities and from which each Mutual Entity collects a percentage of the insurance premiums and certain other fees associated with such programs.

18.     The Mutual Entities' rent-a-captive program at issue in this Complaint combined features of a "fronting program" and "captive reinsurance." Generally, in a fronting program, an established insurance company issues an insurance policy as a "front" for what is effectively self-insurance. The insurer charges the insured a fee for providing the "fronting" service and generally is insulated from the majority of any actual losses by reinsurance it "purchases" from a "captive" reinsurance company, through indemnification by the self-insuring entity, or both.

19.     Generally, a "captive" reinsurance company is one that exists solely to provide reinsurance to one or more insurance companies with which it has a corporate or other affiliation. A fronting insurance company uses a captive reinsurer in much the same way the self-insured entity uses a "fronting" insurance company; i.e., the reinsurer collects a fee for providing reinsurance "on paper" but may actually assume no risk or only a small portion of any risk. Together, "fronting" insurance and a "captive" reinsurer can provide the means through which an insured or group of insureds may essentially self-insure substantial risk, obtain favorable tax treatment for the transaction, and avoid certain costs and constraints associated with purchasing traditional commercial insurance.

20.     In 1997, the Mutual Entities actively marketed their rent-a-captive program to American Patriot, which was considering employing such an approach in connection with an existing insurance program providing workers' compensation, auto and general liability coverage to roofing contractors (the "Roofers' Advantage Program"). The Mutual Entities advised American Patriot that it could expect to obtain the benefits of the rent-a-captive program described in the preceding paragraph should it commit to insure the Roofers' Advantage Program through the Mutual Entities.

21.     In or about March of 1997, American Patriot decided to insure the Roofers' Advantage Program through the Mutual Entities' rent-a-captive facility (the "Program"). The Mutual Entities informed American Patriot that the various contracts/agreements necessary to implement the Program -- which included contracts executed on behalf of Legion, Commonwealth Risk and another related company, Mutual Holdings, Ltd. -- were standard, form agreements, the terms of which were non-negotiable. American Patriot subsequently executed those agreements, which consisted of: (1) proposals provided by Commonwealth Risk for each separate year of the Program ("Proposals"); (2) an agency agreement between Legion and American Patriot ("Agency Agreement"); and (3) a Shareholder Agreement between American Patriot and Mutual Holdings, Ltd. (the "Shareholder Agreement"). True and correct copies of the Proposal for the 1997 Program Year, the Agency Agreement and the Shareholder Agreement (including its Amendments) are attached hereto as Exhibits 1-3, respectively. True and correct copies of the Proposals for the 1998 and 1999 Program Years are attached hereto as Exhibits 4 and 5, respectively.

22.     For the first three years, the Program essentially operated as follows. Legion retained total control over the underwriting process for the Program, including the authority to set the premiums to be charged. Legion issued worker's compensation, auto and comprehensive general liability policies to the roofing contractors (the ultimate insureds). Cunningham-Lindsey contracted with Legion and American Patriot to provide all claims-handling services on the Program, including the setting of reserves.

23.     As the policy issuer, Legion received all premiums from insureds and, through Cunningham-Lindsey, paid all claims to insureds. As part of the Program, Legion reinsured a portion of the policy limits with Mutual Indemnity. That arrangement was governed by a Reinsurance Agreement between Legion and Mutual Indemnity (the "Reinsurance Agreement"). Plaintiffs were only just

recently permitted by the Mutual Entities to examine this crucial document, a true and correct copy of which is attached as Exhibit 6. As amended from year to year, the Reinsurance Agreement limited Mutual Indemnity's maximum liability for each Program year to a percentage of the gross written premiums.

24.     At the beginning of every Program year, Legion kept 10% of the gross premium received from insureds as its retention in order to have cash on hand to pay losses and expenses under the policies. Then, after subtracting its fees and costs, Legion paid the remainder of the premiums to Mutual Indemnity. In turn, after subtracting its costs and fees, Mutual Indemnity retained all remaining amounts, which it invested in securities and other financial instruments designed to generate positive returns. The parties referred to the net amounts Legion paid to Mutual Indemnity as the Ceded Loss Fund. Together, Legion's retention and the Ceded Loss Fund are hereinafter referred to as the "Loss Fund."

25.     Once the losses and expenses in any Program year exceeded Legion's retention, Legion would notify Mutual Indemnity of the total amount of claims and expenses incurred for the Program in the operative period and Mutual Indemnity would reimburse Legion from the portion of the Loss Fund it retained. As the Program issued policies and collected premium on a rolling basis, frequently Legion would first offset loss amounts due before remitting premium to Mutual Indemnity.

26.     The Program Agreements further contemplated that the Loss Fund might not be sufficient to cover all losses incurred on claims asserted under the policies Legion issued through the Program. Thus, pursuant to the Program Agreements, when the Losses exhausted the Ceded Loss Fund held by Mutual Indemnity for that Program year, American Patriot assumed responsibility for paying on Mutual Indemnity's behalf any additional amounts Mutual Indemnity was obligated to pay Legion for losses pursuant to the Reinsurance Agreement. In order to secure its obligations to Mutual Indemnity,

American Patriot was required to post irrevocable letters of credit as collateral to cover certain possible, additional losses up to a specific percentage of the gross premium for that Program year. The amount of the collateral was dictated by the difference between the Loss Fund and what the parties referred to as the "Aggregate Attachment Point." The Aggregate Attachment Point also was set at a percentage of gross written premiums. For example, if the Loss Fund totaled $1 million and the Aggregate Attachment Point was $2 million, American Patriot would have been required to post letters of credit for the difference of $1 million.

27.     Although not revealed to Plaintiffs at any time prior to Plaintiffs' obtaining a copy of the Reinsurance Agreement on or about April 2, 2002, it is now apparent that the Aggregate Attachment Point was fixed at the limits of Mutual Indemnity's obligations to Legion. In other words, Plaintiffs' liabilities to Mutual Indemnity under the Shareholder Agreement could be no greater than Mutual Indemnity's liability to Legion. However, any losses in any Program year that exceeded Mutual Indemnity's obligations were to be Legion's responsibility. Legion purchased its own reinsurance to provide coverage for losses in excess of Mutual Indemnity's and Plaintiffs' limits of liability as specified by the Program Agreements.

28.     The Program was officially launched through the Mutual Entities on March 24, 1997. It was subsequently renewed in 1998 and 1999. American Patriot also served as the broker for the program, receiving a pre-set commission on policies sold to insureds. Of note, in 1998, the Mutual Entities decided, for reasons not yet fully known to Plaintiffs, to have all worker's compensation policies issued by Villanova. In June 1999, Villanova issued all Program policies. Villanova's rights and obligations mirrored those of Legion and thus will be referred to throughout this Complaint as those of Legion.

29. The Shareholder Agreement was also amended from time to time. Of note, in 1998, Diane and Kenneth Hendricks assumed all obligations of American Patriot under the Shareholder Agreement.

30. Over the course of the first three years of the Program, Legion received approximately $48 million in premiums. Legion and Mutual Indemnity received approximately 20% of that amount as fees for their respective services. Though not disclosed to American Patriot or the Hendricks, portions of those amounts ultimately were distributed to Commonwealth Risk as well.

31. In 1999, the Mutual Entities discovered that Cunningham-Lindsey, the third party administrator responsible for handling all claims under the Program, had been under-reserving the claims since the inception of the Program. American Patriot and the Hendricks became aware of this fact at or about the same time. The Mutual Entities and Cunningham-Lindsey subsequently assured American Patriot and the Hendricks that these problems would be resolved.

32. Although not revealed to American Patriot or the Hendricks, the Mutual Entities were seriously concerned about Cunningham-Lindsey's under-reserving, as the Mutual Entities had relied upon those reserves to set premiums for renewals and new policies being issued. As a result, there was a concern that the projected losses would substantially exceed the Program premiums going forward. The Mutual Entities also discovered, but did not reveal to American Patriot or the Hendricks, another flaw in the underwriting process, namely, that the underwriters were using an incorrect methodology to project the loss ratio for each Program year. Specifically, the data upon which the underwriters relied incorrectly assumed that all policies had a common expiration date, when in fact Legion issued policies on a rolling basis throughout the year as the risks were presented for coverage. This error further misrepresented the true target loss ratio used to set the price for new and renewal policies.

33. In early 2000, Plaintiffs discovered that Cunningham-Lindsey continued to reserve claims at levels far below what Plaintiffs perceived to be their actual value, and Plaintiffs suspected this problem might also impact the premium charged for subsequently-issued policies. Concerned over the status of the Program and the potential financial implications in the future, Plaintiffs requested a meeting with the Mutual Entities to discuss the future of the Program and the parties' respective responsibility for any financial shortfalls resulting from these errors.

34. The initial meeting was held in February of 2000 at American Patriot's offices in Oak Brook, Illinois between Diane Hendricks, Lysa Saran (American Patriot's Chief Operating Officer), and Eric Bossard and James Agnew, both Vice-Presidents of Commonwealth Risk at the time.

35. Of paramount concern to the Hendricks was the maximum liability they could face now that the reserving problems plaguing the Program made clear that the losses on the Program would be substantial and might well exceed the limits of Legion's separate reinsurance. None of the Program documents the Mutual Entities had provided the Hendricks or American Patriot up to that point in time expressly addressed who bore responsibility for Program losses within Legion's policy limits but exceeding the Loss Fund and/or any separate reinsurance Legion purchased for its own protection. Specifically, Plaintiffs did not have a copy of the Reinsurance Agreement or its Exhibits, which would have demonstrated that Mutual Indemnity's potential liability -- and thus the Hendricks' potential liability -- was in fact limited to a specified percentage of the premium. Lacking any applicable documentation, Diane Hendricks inquired at this February 2000 meeting whether Mutual Indemnity reinsured the entire limits of liability of Legion's policies, and thus whether the Hendricks' liability ultimately extended to Legion's policy limits. Messrs. Agnew and Bossard responded that such a result "was possible" but that they would check and get back to her.

36. At that same meeting, Diane Hendricks expressed a reluctance on the part of all Plaintiffs to continue the Program with the Mutual Entities or to provide them any additional collateral absent some assurances that there was an ultimate cap on the Hendricks' liability and that the Mutual Entities had made changes in the reserving process to ensure the Program was adequately priced and funded going forward. Again, Agnew and Bossard promised "to investigate" and respond in the near future.

37. Upon information and belief, within the next week, Messrs. Agnew and Bossard conveyed Diane Hendricks' questions and concerns to Glenn Partridge, an Executive Vice-President of Legion and Richard Turner, the President of Commonwealth Risk. Both Partridge and Turner were members of the Board of Directors of Mutual Risk and, on information and belief, so remain to this day.

38. Upon information and belief, Messrs. Partridge and Turner contacted in-house legal counsel for Legion, Andrew Walsh, and asked him whether Mutual Indemnity and/or the Hendricks were responsible for losses up to Legion's policy limits. Mr. Walsh indicated that liability for losses beyond those reinsured by Mutual Indemnity were actually the responsibility of Legion. Partridge and/or Turner then asked Walsh whether the Reinsurance Agreement could be changed retroactively to place such liability with Mutual Indemnity (and thus ultimately with the Hendricks). Mr. Walsh indicated that no such changes to the Reinsurance Agreement were possible.

39. Upon information and belief, Messrs. Partridge and Turner, that same day, nevertheless instructed Messrs. Agnew and Bossard to inform the Hendricks that the Hendricks were in fact responsible for all Program losses up to Legion's policy limits. Partridge and Turner further instructed Messrs. Bossard and Agnew to propose to the Hendricks that, in return for certain payments from the Hendricks, Legion and/or Mutual Indemnity would purchase new reinsurance that would relieve the Hendricks of liability for such losses for Program Years 1, 2 and 3 and thus cap their potential exposure at the Aggregate Attachment Point. Messrs. Agnew and Bossard conveyed that message to the

Hendricks later that same week via a telephone call to Lysa Saran in American Patriot's office in Illinois.

40. On information and belief, at the time Mr. Partridge and/or Mr. Turner instructed Messrs. Bossard to tell the Hendricks that the Hendricks they bore responsibility for losses in excess of the reinsurance provided by Mutual Indemnity, each of them knew such a statement was materially false and misleading.

41. In reliance upon these false representations, the Hendricks agreed to pay Mutual Indemnity $480,000 and amounts in the future that could total up to $1 million to cap what the Mutual Entities falsely told them was their liability for future losses under the Program. In return, Mutual Indemnity agreed to purchase the reinsurance. A true and correct copy of the April 20, 2000 Letter Agreement governing this arrangement is attached hereto as Exhibit 7. The ultimate negotiations over the final terms of that Letter Agreement were handled by David Alexander, Mutual Indemnity's President. Alexander and Mutual Indemnity thus became a part of the conspiracy to defraud the Hendricks as the statements in that Letter Agreement regarding this phantom reinsurance were knowingly false. The Hendricks have now fully paid that $1 million to the Mutual Entities. On information and belief, Mutual Indemnity never purchased any reinsurance, nor could it have done so on the Hendricks' behalf, as the Hendricks never had such risk to reinsure in the first place. Rather, on information and belief, the Mutual Entities took the $1 million they induced the Hendricks to pay and instead applied it to offset Legion's own liabilities under the Program.

42. At the same time, Mr. Bossard informed the Plaintiffs that their concerns about the reserving and underwriting process had been resolved, as Legion had implemented an entirely new underwriting system that would ensure adequate funds would be available for Program losses on policies issued on a going forward basis. In reliance on both the assurances that those changes had in

fact been made and the Mutual Entities' agreement to purchase reinsurance to cap what the Hendricks perceived to be their substantial but unquantified liability for Program losses in years 1, 2 and 3, the Hendricks agreed to renew the Program with the Mutual Entities for the next year. Moreover, in accordance with what they perceived to be their obligations, the Hendricks issued new, irrevocable letters of credit in favor of Mutual Indemnity, the sum of which totaled approximately $8.9 million. Of that amount, Mutual Indemnity applied $4,676,000 as collateral to secure against potential losses for the 2000 Program Year. Had the Hendricks known that the Mutual Entities had lied to and defrauded them, they would not have renewed the Program for the fourth year and would not have given the Mutual Entities access to irrevocable letters of credit.

43.     Later, in a purported effort to fully document the arrangements set forth in the April 20, 2000 letter, Mutual Indemnity suggested that the Shareholder Agreement be amended to "document" the cap on the Hendricks' liability for the first three years of the Program. Significantly, Mutual Holdings -- not Mutual Indemnity -- executed the Shareholder Agreement with the Hendricks and thus was the only Mutual Entity with authority to effect valid modifications to the parties' respective rights under that Agreement. Mutual *Indemnity* nonetheless proposed language to amend the Shareholder Agreement to reflect that the Hendricks' liability was capped for the first three years of the Program as a result of the (phantom) reinsurance. However, the Amendment went further to state that, for the fourth year of the Program, the Hendricks were liable to indemnify both *Mutual Holdings **and Legion*** for losses up to Legion's policy limits.

44.     Again, in reliance on the Mutual Entities' false misrepresentations, the Hendricks signed that document as Amendment 5 to the Shareholder Agreement.

45.     Due to continuing losses, the Program was not renewed for the 2001 Program Year. Over the course of the last year, losses under each year of the Program have continued to mount at an

alarming rate. Those losses are at least in part the direct result of the errors in the reserving and underwriting process that deprived the Program of millions of dollars in premium that should now be available to pay claims. Faced with further potential losses, the Mutual Entities have now demanded that the Hendricks fund an additional approximately $2 million in losses for the 1997-99 Program Year, which they claim represent amounts in excess of the Loss Fund, up to the limits of Mutual Indemnity's liability.

46.     According to the Mutual Entities' own reports, however, losses for Program Year 2000 have not yet exceeded the Loss Fund. Plaintiffs therefore have disputed Mutual Indemnity's claims that it has actually paid Program losses in excess of the Loss Fund for years 1997-99. Plaintiffs have further requested the Mutual Entities to provide backup documentation to verify any such payments, as well as complete copies of actuarial data on which the Mutual Entities have relied. To date, the Mutual Entities have refused Plaintiffs' requests.

47.     Despite the fact that losses for Program Year 2000 have not yet exceeded the Loss Fund, Mutual Indemnity has now threatened to draw down on the letters of credit the Hendricks were required to post in connection with renewal of the Program in March, 2000. However, based upon the Mutual Entities' own calculations of the amounts claimed to be owed, approximately $4.7 million of the $8.9 million posted clearly is allocated only towards the 2000 Program Year. Accordingly, as no losses exceed the total Loss Fund, the Mutual Entities have no legitimate right to draw on at least that $4.7 million.

48.     Plaintiffs only discovered the true nature of the Mutual Entities' deception in April of 2002, when Plaintiffs finally obtained a copy of what the Mutual Entities have represented to be the Reinsurance Agreement applicable to the Program. The Reinsurance Agreement provided by the Mutual Entities confirms that, contrary to the Mutual Entities' more recent misrepresentations, both

Mutual Indemnity's -- and the Hendricks' -- liability to Legion is in fact capped at a fixed percentage of the Program premium.

## COUNT I - FRAUD

### (The Hendricks vs. Mutual Risk, Mutual Indemnity, Commonwealth Risk, Partridge, Turner and Alexander)

49.    The Plaintiffs incorporates by reference the allegations contained in Paragraphs 1 through 48, as though fully set forth herein.

50.    Over the course of the Program, the Mutual Entities and the individual Defendants at all times, acting for the benefit of one another, made the following, deliberate misstatements of material fact:

    (a)    The Hendricks were liable for all losses, up to Legion's policy limits;

    (b)    The Mutual Entities would use funds procured from the Hendricks to purchase new reinsurance to protect the Hendricks against that phantom risk; and

    (c)    Amendment 5 to the Shareholder Agreement was necessary to "document" the parties' relationship as it existed and was modified by the Mutual Entities' purported purchase of "reinsurance" on the Hendricks' behalf;

51.    Said misstatements of material fact were made by the Mutual Entities and the individual Defendants with the knowledge that they were false and with the intent that the Hendricks rely upon those statements.

52.    In reliance on said false statements, the Hendricks:

    (a)    paid Mutual Indemnity $1 million for unnecessary, illusory reinsurance;

    (b)    executed Amendment 5, thereby transferring to themselves liabilities for the 2000 Program year that properly resided with Legion;

    (c)    renewed the Program for the 2000 Program Year; and

    (d)    provided new letters of credit ultimately totaling approximately $8.9 million for the benefit of the Mutual Entities.

53.     As a result of the aforementioned false and fraudulent statements, the Hendricks have suffered damages consisting of, *inter alia*, the $1 million paid to Mutual Indemnity, which in turn benefited all of the Mutual Entities; fees incurred and the loss of potential investment income in providing additional letters of credit on which the Mutual Entities now threaten to convert to their benefit; barring rescission of Amendment No. 5, virtually unlimited losses attributable to the 2000 Program Year; and other potential damages likely to occur in the future based on the Mutual Entities' continuing wrongful conduct.

54.     The Hendricks are entitled to recover their actual damages as a result of said fraudulent conduct plus interest, attorneys' fees and punitive damages.

**WHEREFORE**, Plaintiffs Diane M. and Kenneth A. Hendricks request that this Court enter judgment in their favor and against Mutual Risk, Mutual Indemnity, Commonwealth Risk, Glenn Partridge, Richard Turner and David Alexander, jointly and severally, and that they receive their actual damages, punitive damages, costs, interest, attorneys' fees and such further relief as this Court deems proper.

## COUNT II – CONSPIRACY

### (The Hendricks vs. MRM, Mutual Indemnity Commonwealth Risk, Partridge, Turner and Alexander)

55.     Mutual Risk, Mutual Indemnity and Commonwealth Risk, Partridge, Turner and Alexander conspired to defraud the Hendricks by, *inter alia*:

(a)     representing that the Hendricks' potential exposure extended to Legion's policy limits, despite knowledge to the contrary;

(b)     promising to purchase reinsurance on behalf of the Hendricks against a risk that did not exist;

(c)     falsely representing that they had purchased such reinsurance;

       (d)      collecting $1 million from the Hendricks as a result;

       (e)      fraudulently procuring Amendment No. 5; and

       (f)      obtaining, under false pretenses, additional and/or renewed letters of credit upon which they could drawn down and use to fund their illegal activities.

56.    Said actions constituted a combination of two or more persons for the purpose of accomplishing, through concerted action, either an illegal object or object by illegal means.

57.    As a result, the Hendricks have suffered and are entitled to recover actual damages in an amount yet to be determined in excess of $1 million. The Hendricks are further entitled to punitive damages as a result of such knowing and intentional wrongful conduct.

**WHEREFORE**, Plaintiffs Diane M. and Kenneth A. Hendricks request that this Court enter judgment in their favor and against Mutual Risk, Mutual Indemnity, Commonwealth Risk, Glenn Partridge, Richard Turner and David Alexander, jointly and severally and that they receive their actual damages, punitive damages, costs, interest, attorneys' fees and such further relief as this Court deems proper.

## COUNT III - RICO
### (Against Mutual Indemnity, Commonwealth Risk, Partridge, Alexander and Turner for Violation of 18 U.S.C. §1962(c))

58.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 57, as though fully set forth herein.

### The Enterprise

59.    Mutual Risk was and is an ongoing "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4) ("the Mutual Risk Enterprise"). The Mutual Risk Enterprise has an identifiable structure, with each member fulfilling a specific role to carry out and facilitate its purposes.

60.    Defendants Mutual Indemnity, Commonwealth Risk, Partridge, Alexander and Turner, and others working for Mutual Risk, Mutual Indemnity and Commonwealth Risk, are employed by,

and/or are associated with, the Mutual Risk Enterprise, have extensively participated in the fraudulent

activities, and have been vital to the success of the fraudulent activities undertaken by the Mutual Risk

Enterprise.

61.     The Mutual Risk Enterprise engages in, and its activities affect, interstate commerce.

## The Purpose of the Defendants

62.     The purpose of the Defendants Mutual Indemnity, Commonwealth Risk, Partridge,

Alexander and Turner has been and is to illicitly and illegally enrich themselves at the expense of

Plaintiffs and, on information and belief, other participants in the insurance marketplace, by developing,

marketing and administering insurance programs containing fronting and captive reinsurance features

("the rent-a-captive programs") to systematically and deliberately defraud participating members by,

*inter alia*, under-reserving claims; inducing and accepting payment for reinsurance without acquiring the

same; misrepresenting the liabilities of participating members; fraudulently inducing the member(s) to

pledge letters of credit worth millions of dollars; and drawing upon the same under the false pretenses

described herein.

## Pattern of Racketeering Activities

63.     Defendants Mutual Indemnity, Commonwealth Risk, Partridge, Alexander and Turner

have knowingly conducted and/or participated, directly and indirectly, in the affairs of the Mutual Risk

Enterprise through a "pattern of racketeering activity," as defined by Title 18, United States Code,

Section 1961(5). The pattern of racketeering activity has consisted of repeated and continuous violations

of the federal mail fraud statute, Title 18, United States Code, Section 1341, and the federal wire fraud

statute, Title 18, United States Code, Section 1343, all of which activity has been related to the purposes

of the Mutual Risk Enterprise and includes, but is not limited to:

(a)     The February 2000 telephone call to Plaintiffs from Messrs. Agnew and Bossard,
        at the express instruction of Defendants Partridge and Turner:

18

      (i)      falsely informing the Hendricks that the Hendricks were responsible for all losses in the Program up to Legion's policy limits, when in fact liability for losses beyond those reinsured by Mutual Indemnity were the responsibility of Legion; and

      (ii)     fraudulently inducing the Hendricks to pay Mutual Indemnity amounts totaling $1 million to purchase reinsurance to relieve them of this phantom liability and to cap their alleged potential exposure;

(b)     The April 20, 2000 Letter Agreement signed by David Alexander and mailed to the Hendricks, confirming and purporting to set the terms and conditions for governing the fraudulent reinsurance arrangement;

(c)     The March 28, 2000 communications by Bossard to the Hendricks that Legion had implemented an entirely new underwriting system that would adequately fund the Program, in order to fraudulently induce the Hendricks to renew the Program for the next year and to fraudulently induce the Hendricks to issue new, irrevocable letters of credit to Mutual Indemnity, which total $8.9 million in the aggregate;

(d)     The November 1, 2001 letter mailed from Mutual Indemnity to the Hendricks, proposing an amendment to the April 20, 2000 Letter Agreement, falsely misrepresenting that the Hendricks' liability was capped for the first three years of the Program, but that the Hendricks were liable for losses up to policy limits for the fourth year of the Program; and

(e)     The February and March, 2002 communications to the Hendricks by Mutual Indemnity, fraudulently misrepresenting the Hendricks' liability for losses allegedly incurred for the years 1997, 1998 and 1999 of the Program, in excess of the Loss Fund, and threatening to draw down on the letters of credit posted by the Hendricks, notwithstanding the fact that $4,676,000 of that amount is clearly allocated to the 2000 Program year, for which year losses have not yet exceeded the Loss Fund, and that other amounts remain substantially in dispute.

### Injury to Plaintiffs

64.     As a direct and proximate result of the conduct of Defendants Mutual Indemnity, Commonwealth Risk, Partridge, Alexander and Turner as set forth herein, Plaintiffs were injured in their business and property in that they paid more than $1 million in connection with the fraudulent activities and administration of the "rent-a-captive" program, as described above, and have incurred other substantial investigative and litigation expenses in an amount to be determined at trial.

65.     Because of the nature of the fraud of the Defendants Mutual Indemnity, Commonwealth Risk, Partridge, Alexander and Turner, Plaintiffs did not discover their injury, and could not reasonably have been expected to do so, until April of 2002.

66.     By reason of their injury, Plaintiffs are entitled to treble damages, costs and reasonable attorneys' fees, pursuant to Title 18, United States Code, Section 1964(c).

**WHEREFORE**, Plaintiffs Diane M. and Kenneth A. Hendricks request that this Court enter judgment in their favor and against Defendant Mutual Risk, and that they receive treble damages, costs and reasonable attorneys' fees, in an amount to be determined at trial, and such further relief as this Court deems proper.

## COUNT IV - RICO

### (Against Mutual Risk for Violation of 18 U.S.C. §1962(a))

67.     Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 66, as though fully set forth herein.

68.     By virtue of the actions of its employees, subsidiaries and affiliates including, but not limited to, Defendants Mutual Indemnity, Commonwealth Risk, Partridge, Alexander and Turner, Defendant Mutual Risk has received income, directly and indirectly, from the pattern of racketeering activity described, in part, in Paragraphs 17 through 48, directed against the Plaintiffs.

69.     Mutual Risk has used and/or invested, directly or indirectly, part of that income and/or the proceeds of that income, in the operation of the Mutual Risk Enterprise.

70.     The Mutual Risk Enterprise engages in, and its activities affect, interstate commerce.

### Injury to Plaintiffs

71.     As a direct and proximate result of the conduct of the Defendant Mutual Risk, Plaintiffs were injured in their business and property in that they paid more than $1 million in connection with the

fraudulent activities of the Mutual Risk Enterprise, as described above, and have incurred other substantial investigative and litigation expenses in an amount to be determined at trial.

72.     Because of the nature of the fraud of the Mutual Risk Enterprise, Plaintiffs did not discover their injury, and could not reasonably have been expected to do so, until April of 2002.

73.     By reason of their injury, Plaintiffs are entitled to treble damages, costs and reasonable attorneys' fees, pursuant to Title 18, United States Code, Section 1964(c).

**WHEREFORE**, Plaintiffs Diane M. and Kenneth A. Hendricks request that this Court enter judgment in their favor and against Defendant Mutual Risk, and that they receive treble damages, costs and reasonable attorneys' fees, in an amount to be determined at trial, and such further relief as this Court deems proper.

## COUNT V– NEGLIGENT MISREPRESENTATION

**(The Hendricks vs. Mutual Risk, Mutual Indemnity and Commonwealth Risk)**

74.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 73 above, as though fully set forth herein.

75.     In the alternative to the allegations of fraud, Defendants Mutual Risk, Mutual Indemnity and Commonwealth Risk misrepresented the nature of the various Agreements and the Hendricks' potential exposure.

76.     In reliance on said false statement, the Hendricks:

      (a)     paid Mutual Indemnity $1 million for unnecessary, illusory reinsurance;

      (b)     executed Amendment 5, thereby increasing their own obligations for the 2000 Program year;

      (c)     renewed the Program for the 2000 Program Year; and

      (d)     provided new Letters of Credit ultimately totaling $8.2 million, of which $4,676,000 was in relation to the 2000 Program Year.

77.     As a result, the Hendricks have suffered and are entitled to recover actual damages in an amount yet to be determined in excess of the $1 million paid for the phantom reinsurance. The Hendricks are further entitled to punitive damages as a result of such knowing and intentional wrongful conduct.

**WHEREFORE**, Plaintiffs Diane M. and Kenneth A. Hendricks request that this Court enter judgment in their favor and against Mutual Risk, Mutual Indemnity and Commonwealth Risk, and that they receive their actual damages, punitive damages, costs, interest, attorneys' fees and such further relief as this Court deems proper.

## COUNT VI - ACCOUNTING

### (The Hendricks and American Patriot v. Mutual Risk, Mutual Indemnity and Commonwealth Risk)

78.     Plaintiffs incorporate by reference the allegations contained in paragraph 1 through 77 above as though fully set forth herein.

79.     The Mutual Entities have failed and refused, despite requests, to allow Plaintiffs reasonable access to their accounting records and actuarial reports to verify the amounts at issue under the various Program Agreements.

80.     In order to fully determine the respective rights and obligation of the parties, as well as to determine the extent of the Mutual Entities' fraud, the Plaintiffs require an accounting by the Mutual Entities of all funds received and expended under the Program.

**WHEREFORE**, Plaintiffs Diane M. and Kenneth A. Hendricks request that this Court enter an Order for an accounting of all amounts under the Program in their favor and against Mutual Risk, Mutual Indemnity and Commonwealth Risk, and that they receive such further relief as this Court deems proper.

## COUNT VII – RESCISSION

### (The Hendricks v. Mutual Indemnity)

81.     Plaintiff's incorporate by reference the allegations contained in paragraph 1 through 80 above as though fully set forth herein.

82.     Mutual Indemnity promised to procure reinsurance to protect the Hendricks from a risk of liability that the Mutual Entities knew did not exist and for which the Hendricks ultimately paid Mutual Indemnity $1 million. Said payments were procured by fraud. Moreover, said agreement was not supported by consideration, as the Hendricks never received any actual benefit, a fact the Mutual Entities consciously concealed from the Hendricks.

83.     In the alternative, that contract was entered into based upon a mutual mistake of material fact regarding the Hendricks' right and obligations.

84.     When a contract is procured by fraud, not supported by consideration and/or based upon a material mistake of material fact, the appropriate remedy is to rescind the contract and return all parties to their original positions. In this case, that would require a return to the Hendricks of $1 million.

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor rescinding said contract, and restoring the parties to the status quanta by returning the sum of $1 million to the Hendricks, and grant such further relief as this Court deems proper.

### COUNT VIII– BREACH OF CONTRACT

### (American Patriot and the Hendricks vs. Mutual Risk, Mutual Indemnity, Commonwealth Risk and Cunningham-Lindsey)

85.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 84 above, as though fully set forth herein.

86.     Through their contracts with American Patriot, the Mutual Entities agreed to employ proper underwriting and claims administration practices in connection with the Program. Similarly,

Cunningham-Lindsey contracted with the Mutual Entities and American Patriot to, among other things, properly investigate and evaluate the claims asserted on policies issued through the Program, including setting accurate reserves. Upon assignment of all interests in the Shareholder's Agreement to the Hendricks, the Hendricks became third-party beneficiaries of said obligation.

87. Beginning in 1998 and continuing through 2000, Defendants breached said contractual obligation by failing to set proper reserves.

88. Unbeknownst to Plaintiffs, Legion relied upon said reserves in deciding whether to renew policies and if so, at what premiums. As a result, numerous policies were renewed and/or under-priced because of the inaccurate reserve information.

89. Plaintiffs did not discover that the contracts had been breached in this manner and that damages had resulted until on or about July, 2001.

90. As a direct and proximate cause of said breaches of contract, Plaintiffs sustained damages. The Hendricks' damages consist of as yet undetermined amounts for which they could ultimately be liable resulting from the program being underfunded as a result directly from faulty reserving and underwriting procedures. American Patriot's damages consist of, *inter alia*, lost premiums from underpricing the program, costs and expenses it has incurred monitoring the reserving process after the flaws were exposed, and its actual costs incurred setting up the Roofer's Program for long-term marketing.

91. Plaintiffs have satisfied all obligations they have under said contracts.

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and against Mutual Risk, Mutual Indemnity, Commonwealth Risk and Cunningham-Lindsey, and that they receive their actual damages, costs, interest, attorneys' fees and such further relief as this Court deems proper.

## COUNT IX - NEGLIGENCE

### (American Patriot and the Hendricks vs. Mutual Risk, Mutual Indemnity, Commonwealth Risk and Cunningham-Lindsey)

92.     Plaintiffs incorporate by reference the allegations contained in paragraph 1 through 91 above as though fully set forth herein.

93.     Defendants undertook the responsibility of providing accurate reserves and accurately setting premiums.

94.     Defendants breached their duties owed to Plaintiffs by failing to exercise the proper degree of knowledge and skill and so negligently, carelessly, recklessly, wantonly, setting both artificially low reserves and artificially low premiums.

95.     As a direct and proximate cause of said breaches of contract, Plaintiffs sustained damages. The Hendricks' damages consist of as yet undetermined amounts for which they could ultimately be liable resulting from the Program being grossly under funded as a direct result of Defendants' faulty reserving and underwriting procedures. American Patriot's damages consist of, *inter alia*, lost commissions on premiums from Defendants' under pricing of the Program policies, costs and expenses it has incurred monitoring the reserving process after said flaws were exposed, and other related costs yet to be determined.

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and against Mutual Risk, Mutual Indemnity, Commonwealth Risk and Cunningham-Lindsey, jointly and severally, and that they receive their actual damages, punitive damages costs, interest, attorneys' fees and such further relief as this Court deems proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: ~~April 15~~ , 2002

DIANE M. AND KENNETH A. HENDRICKS
AMERICAN PATRIOT INSURANCE AGENCY, INC.

By: _____
One of their Attorneys

Bruce R. Meckler
Steven D. Pearson
Eric D. Stubenvoll
Matthew R. Wildermuth
MECKLER BULGER & TILSON
123 North Wacker Drive
Suite 1800
Chicago, Illinois 60606
(312) 474-7900
(312) 474-7898 (facsimile)

O:\7512\pleading\complaint01.doc

# SEE CASE FILE FOR EXHIBITS

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**

American Patriot Insurance Agency, Inc, et al.

**DEFENDANTS**

Mutual ~~DOCKETED~~ agement, Ltd. et al.

APR 17 2002

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  DuPage
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Meckler Bulger + Tilson
123 N. Wacker Dr., Suite 1800
Chicago, IL 60606    (312) 474-7900

ATTORNEYS (IF K...)

# 02C 2728

JUDGE CASTILLO    MAGISTRATE JUDGE MASON

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR P... AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF |
|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This cause is being brought pursuant to 28 U.S.C. §1332 and pursuant to 28 U.S.C. §1331 as Plaintiffs' claims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1962, arise under the laws of the United States

**VII. REQUESTED IN COMPLAINT**

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☐ ☒ YES

**VIII.** This case ☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE
1/11/02

SIGNATURE OF ATTORNEY OF RECORD
Bruce R. Meckler

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the Matter of

American Patriot Insurance Agency, Inc., et al.
Plaintiffs,

v.

Mutual Risk Management, Ltd., et al.
Defendants.

**JUDGE CASTILLO**

**DOCKETED**
APR 1 7 2002

**02C 2728**

Case Number:

**MAGISTRATE JUDGE MASON**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:
Plaintiffs

| (A) | (B) |
|---|---|
| SIGNATURE *Bruce R. Meckler/lah* | SIGNATURE |
| NAME Bruce R. Meckler | NAME Steven D. Pearson |
| FIRM Meckler Bulger & Tilson | FIRM Meckler Bulger & Tilson |
| STREET ADDRESS 123 North Wacker Drive, Suite 1800 | STREET ADDRESS 123 North Wacker Drive, Suite 1800 |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP Chicago, IL 60606 |
| TELEPHONE NUMBER (312) 474-7900 | TELEPHONE NUMBER (312) 474-7900 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06181171 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06190506 |
| MEMBER OF TRIAL BAR? YES [X] NO [ ] | MEMBER OF TRIAL BAR? YES [X] NO [ ] |
| TRIAL ATTORNEY? YES [ ] NO [ ] | TRIAL ATTORNEY? YES [X] NO [ ] |
| | DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [ ] |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Eric D. Stubenvoll | NAME Matthew R. Wildermuth |
| FIRM Meckler Bulger & Tilson | FIRM Meckler Bulger & Tilson |
| STREET ADDRESS 123 North Wacker Drive, Suite 1800 | STREET ADDRESS 123 North Wacker Drive, Suite 1800 |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP Chicago, IL 60606 |
| TELEPHONE NUMBER (312) 474-7900 | TELEPHONE NUMBER (312) 474-7900 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06212104 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06202106 |
| MEMBER OF TRIAL BAR? YES [X] NO [ ] | MEMBER OF TRIAL BAR? YES [X] NO [ ] |
| TRIAL ATTORNEY? YES [X] NO [ ] | TRIAL ATTORNEY? YES [X] NO [ ] |
| DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [ ] | DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [ ] |